IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DIANE S. WILKINS,

             Plaintiff,

      v.                                        Civil Action No. 2:09-CV-111

MICHAEL J. ASTRUE,
Commissioner of Social Security,

             Defendant.


**REPORT AND RECOMMENDATION
SOCIAL SECURITY**

**I. Introduction**

A.      <u>Background</u>

        Plaintiff, Diane Wilkins (Claimant), filed a Complaint on September 11, 2009 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

February 1, 2010.[2]  Claimant filed her Motion for Summary Judgment on March 16, 2010.[3]

Commissioner filed his Motion for Summary Judgment on May 3, 2010.[4]

B.      <u>The Pleadings</u>

        1.        <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 14.

[4] Docket No. 18.

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err by failing to give controlling weight to Claimant's treating physicians and properly assessed Claimant's credibility.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) on May 11, 2007, alleging disability since February 20, 2006, due to back and leg pain and leg numbness. (Tr. 108, 129). The claim was denied initially on June 26, 2007, and upon reconsideration on September 5, 2007. (Tr. 61, 63 & 62, 70). Claimant filed a written request for a hearing on November 30, 2007. (Tr. 73). Claimant's request was granted and a hearing was held on February 10, 2009. (Tr. 85, 22-60).

The ALJ issued an unfavorable decision on April 15, 2009. (Tr. 6-21). The ALJ determined Claimant was not disabled under the Act because she had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 C.F.R. 404.1569, 404.1569a). (Tr. 12-16). On April

29, 2009, Claimant filed a request for review of that determination. (Tr. 4-5). The request for review was denied by the Appeals Council on July 26, 2009. (Tr. 1-3). Therefore, on July 26, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted her administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on September 30, 1958, and was forty-seven (47) years old as of the onset date of her alleged disability and fifty (50) as of the date of the ALJ's decision. (Tr. 108). Claimant was therefore, at the time of the alleged onset disability, considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2010). From the date of the ALJ's decision, Claimant has been a "person closely approaching advanced age" within the meaning of the regulations. 20 C.F.R. § 404.1563(d), 416.963(d) (2010). Claimant graduated from high school and has past relevant experience as a cook and a janitor and working in a sewing factory. (Tr. 31-35, 136, 138).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Outpatient/Emergency Room Records, Rockingham Memorial Hospital, Dr. Baer, Dr. Adamson, 4/22/05 - 2/26/07 (Tr. 216-39)**
4/22/05
- mammogram-diag bilateral
- findings: no suspicious mass, nodule, or cluster of microcalcifications
- conclusion: benign findings

2/21/06
- OP-Spine-Lumbosacral
- conclusion: no fracture; moderate DJD L4-5 and L5-S1; mild DDD T11-12, T12-L1, L4-5, and L5-S1 disc spaces
3/23/06
- MRI spine lumbar w/out contrast
- conclusion:
          - significant central disc protrusion at T10-11 causing significant anterior impression upon the cal sac; may be associated cord edema; recommend dedicated thoracic MRI for further evaluation
          - right paracentral disc protrusion at T12-L1
          - posterior disc bulges at L1-2 and L2-3 with posterior annular fissuring and associated disc bulge at L5-S1
          - degenerative changes of the facets at L4-5 and L5-S1
10/18/06
- chief complaint: extreme pain
- review of systems: right-sided lower extremity pain and back pain; all other 10 organ systems negative for acute disease
- diagnostic impression or assessment: acute sciatica
- treatment: analgesia; follow-up
1/25/07
- preoperative diagnosis: chronic lumbar radiculopathy; lumbar disk degeneration with acceleration and prematurity; lumbar spondylopathy
- postoperative diagnosis: chronic lumbar radiculopathy; lumbar disk degeneration with acceleration and prematurity; lumbar spondylopathy
2/26/07
- punch biopsy mid-back
- final diagnosis: skin lesion from mid-back; punch biopsy: junctional melanocytic nevus

**Treatment Notes, Green Valley Clinic, 12/5/05 - 7/19/07 (Tr. 240-53 & 321-25)**
12/5/05
- subjective: hurts more; continue pain right buttock, hips, and down back of leg; pins/needles in right lower leg/foot
- objective: alert, pleasant; obese; normal BP; nml beck; hypoactive DTR's
- assessment: prob HNP LS spine with radiculopathy
- plan: x-ray LS spine; consider PT
2/22/06
- x-ray LS spine - mod DJD/DDD L4-5, L5-S1
2/27/06
- subjective: still has back pain; leg still hurts some but has improved; not comfortable completely in any position
- objective: alert, pleasant; tender over lower lumbar spine
- assessment: prob HNP LS spine with radiculopathy; DDD/DJD lumbar spine
3/6/06

- subjective: more pain in leg since therapy on Friday; back feels better
- assessment: DDD/DJD lumbar spine with prob HNP LS spine
- plan: continue arthotec; continue PT and traction; no lifting or bending; use Darvocet
3/16/06
- subjective: lot of leg and back pain; requests MRI
3/20/06
- subjective: feels therapy has improved some; not as much pain down her leg but still has low back pain
- assessment: DJD/DDD thoracic lumbar spine; abnormal area T10-11
- plan: refer to neurosurgery; decrease physical therapy
5/11/06
- objective: alert, pleasant but tearful discussing back pain
- assessment: severe disc disease thoracic spine with moderate central canal stenosis; prob onychomycosis
- plan: strone hydrocodone; percocet, lamisel
7/3/06
subjective: saw pain management doctor; fell twice last week
- objective: alert; normal BP; no distress; tender over low lumbar spine; no edema
- assessment: dizziness likely 2 degree to Zanaflex; DJD/DDD LS spine
- plan: decrease Zanaflex; decrease BP at home
1/31/07
- subjective: sees doctor for pain management; had injections in back; pulse good
- objective: alert; normal BP
- assessment: fatigue; depression with anxiety; HTN; obesity; insomnia
- plan: THS, CBC, CMP to lab; observe new skin lesion right nose
2/11/07
- subjective: automobile accident; c/o bruising, pain under right arm
- objective: alert; no distress; non-tender clavicles and sternum; tender over right preaxillary area
- assessment: contusion right breast; abnormal skin lesion mid upper back
- plan: RTC for wide excision/ biopsy; BMP, CBS and lab
2/28/07
- subjective: goes to pain management every month; some weakness in upper extremities
- objective: alert; good BP; nml neck; RSR
- assessment: chronic back pain with radiculopathy; HTN; obesity
- plan: increase medications
7/3/07
- subjective: chest pain and nausea; nml stress test; pulse seems faster recently; BP up since off meds
- objective: alert; weight down 4 lbs; no distress; tearful when discussing health concerns; clear chest; no edema
- assessment: HTN - uncontrolled; hypokalemia; low THS; obesity
- plan: BMP
7/6/07
- changed medications

**Physical Therapy Records, Appalachian Physical Therapy, 2/27/06 - 5/8/06 (Tr. 183-203)**
2/27/06
- diagnosis: lower back pain with right lower extremity radiculopathy with degenerative joint and disc disease throughout the lumbar spine
- treatment: evaluate and treat accordingly - 2-3 weeks


3/1/06
- subjective: sore yesterday following evaluation; back pain worse but leg better; feeling better this morning
- assessment: progressing well
- plan: return in one week
3/3/06
- subjective: felt good yesterday; scrubbed floor
- assessment: progressing well but pushing too hard outside of therapy
- plan: return next week
3/6/06
- subjective: increase leg pain over weekend, possibly related to efforts at using tennis ball
- assessment: seems to be demonstrating s/s related to disc problems, limited by her tolerance and other issues
- plan: return later in week
3/6/06 status letter
- progress: fourth visit - with each visit claimant reporting continued improvement in her status with decreasing right lower extremity symptoms; leg doing better; did not give a consistently favorable response to manual lower extremity distraction
3/8/06
- subjective: feeling a lot better; still unable to perform standing ext ex 2 degrees onset of buttock pain with this, but otherwise improving
- assessment: overall progressing well with current program
- plan: return later in week
3/10/06
- subjective: LB and R hip sx are better today; still having a lot of soreness and pain in R hip but not much occurring into LE
- assessment: seeming to tolerate tx well and manual stretching and having no c/o incr LB and/or R hip discomfort. C/o soreness cont to be present with palpation t/o central LB and R hip regions
- plan: return next week
3/13/06
- subjective: significant decr pain in morning; aching in LB in evenings
- assessment: tolerated tx well; did not demonstrate any exacerbation of sx w/standing or prone ext.  demonstrates improved tenderness at R hip area
- plan: return later in week; continue as tolerated, progressing as appropriate with current tx plan
3/14/06 status letter
- progress: claimant continues to report gradual improvement in lower back and right lower extremity pain; still complains of lower extremity symptoms; now tolerant of performing standing lumbar extension exercises, which were previously intolerable; fitted with lumbosacral

support which seems to be providing some relief; encouraged to utilize a lumbar roll or cushion in sitting for decreasing stresses on the disc, but has not obtained one through this office
3/15/06
- subjective: continue to note improvement in LB and R LE pain
- assessment: demonstrates decr sensitivity and tenderness at R piriformis; overall making slow but favorable progress
- plan: return later in week and progress tx as patient tolerates
3/17/06
- subjective: felt well after last tx; throbbing pain which started last evening in the R hip and LE
- assessment: responded well to tx and demonstrated decr pain after tx
- plan: return next week; progress ex and manual ther as pt tolerates
3/20/06
- subjective: reports 2 pain-free days over weekend; last night pain in R hip and LE
- assessment: responded well to pelvic tx w/reports of decr pain after tx
- plan: return later in week and will reassess status at that time
3/22/06
- sore from PT last tx; no pain since last tx; able to sleep all night which she has not been able to do for some time
- assessment: did well with tx; no exacerbation of sx with re-introduction of hip capsule mobs or with ambulation on the treadmill; did demonstrate LE fatigue from walking on treadmill
- plan: return Friday; will plan to progress tx and ex as pt tolerates
3/24/06
- subjective: feeling continued improvement in back although still having some R LE pain; better than 1 week ago and definitely improved as compared to time of initial evaluation
- assessment: overall progressing well with current program; traction seems to be helping
- plan: return next week
3/24/06 status letter
- progress: continuing to report very gradual improvement in status with centralization of her right lower extremity radiculopathy; indicates her right lower extremity pain is not extending as far into the leg and her episodes of this are decreasing in frequency and severity; successfully utilizing pelvic traction; continuing to advance her trunk neuromuscular re-education as well as general flexibility and cardiovascular retraining exercises; right lower extremity pain still remains a limiting factor
3/27/06
- subjective: increase LB, R buttock, and upper thigh pain which began Sat morning and persisted all weekend
- assessment: overall progressing well
- plan: reducing pts frequency of tx; PAC request to return once more this week
3/29/06
- cancelled - not feeling well
4/10/06
- subjective: about same when started therapy initially; having LE pain as well as numbness and tingling although is sleeping better at night than previously
- assessment: sore, tolerated Ptx well

- plan: return later in week
4/12/06
- subjective: leg doing better
- assessment: doing well with current program; traction helping
- plan: return later in week
4/17/06
- cancelled - bad cold/cough
4/19/06
- subjective: cold but otherwise doing well; leg pain better although back still very sore
- assessment: progressing favorably, seems to be doing well with current program
- plan: return later in week
4/24/06
- subjective: mid-thoracic region has been bothering her since later last week; LB doing well; leg also doing well
- assessment: sore in thoracic region but better following tx; cont to advance pt's program as tolerated
- plan: return later in week
4/26/06
- subjective: feeling better today and experienced no back pain with sleeping last night; feels stiff in LE, however not having any pain
- assessment: pt responding well to tx; continue to have difficult staying in 1 position for an extended period of time
- plan: return to ther next week
5/2/06
- cancelled
5/4/06
- cancelled
5/8/06 status update
- interrupted service from March 24, 2006, until April 10, 2006
- undergoing further testing and considering surgery
- lower extremity pain worsened in interim
- program resumed consisting of soft tissue stretching, hip capsule mobilization, pelvic traction, other modalities, and assistance with resumption of her previously issued home exercises
- continued to cancel scheduled appointments

**Treatment Records, UVA Department of Family Medicine, Dr. Helm, 4/4/06 - 5/9/06 (Tr. 204-09)**
4/4/06
- good strength and sensation in her lower extremities; not myelopathic
- reviewed MRI of lumbar region - looks quite good
- by report, has disk at T10-T11 with cord edema
- obtain full thoracic MRI scan
4/14/06 MRI Scan
- MRI thoracic spine

- findings: thoracic alignment is normal; discogenic endplate changes are noted at T8-9, T9-10, and T12-L1; cord demonstrates normal signal characteristics; no paraspinal soft tissue abnormality identified
- impression:
    - T4-T5: mild central canal stenosis
    - T6-T7: moderate central canal stenosis
    - T7-T8: moderate central canal stenosis, asymmetric to the right
    - T10-T11: moderate central canal stenosis and mild left neural foraminal stenosis
4/17/06
- most recent MRI scan reveals disk bulges
- not totally convinced they're surgical in nature
- further conservative measures are probably the best option
5/9/06
- having thoracic pain and leg pain
- lumbar MRI scan looks good
- further conservative measures with pain management consultation is best option

**Neurosurgical Consultation, Crystl Willison, M.D., 5/23/06 - 6/8/06 (Tr. 210-15)**
5/23/06
- chief complaint: back pain; N/T right butt/hip
- review of systems: good general health; no ears/nose/mouth/throat problems; no cardiovascular problems; no respiratory problems; peptic ulcer, but no other gastrointestinal problems; back pain, but no other musculoskeletal problems; no neurological problems; depression; no endocrine problems
5/25/06
- has significant facet disease at L4-5 and L5-S1; facet disease is result of load bearing
- impression: degenerative spine disease with lumbar spondylosis, facet arthropathy, and perhaps some more significant thoracic disease; not myelopathic and does not meet strict criteria for operating on the thoracic spine at this time; pain is fairly well managed by oral medications and activity; seriously consider weight reduction for overall health and specifically for spine pathology
6/8/06
- reviewed MRI scan of thoracic spine sent from UVA
- paracentral disc protrusion, probably a herniation that is subligamentous at T7-8 consistent with moderate central canal stenosis - mild to moderate because no flattening or distortion to the cord and no cord edema on MRI scan
- not surgical lesions
- recommend weight loss; consider pain management

**Pain Treatment Progress Notes, Blue Ridge Pain Treatment Center, 6/23/06 - 7/20/07 (Tr. 254-78 & 326-27)**
6/23/06
- chief complaint: back pain, right leg pain
- impressions: thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01;

thoracic disc bulge 722.11; lumbar disc bulging 722.10; lumbar disc degeneration 722.52; muscle spasm and myofascial pain 729.1
- recommendations: continue long acting prescription NSAID arthrotec and start antispasmodic Zanaflex; hydrocodone for pain; return in 3 weeks for follow-up

7/10/06
- subjective: managed chronic right-sided lower back pain; current medications continue to be beneficial for chronic pain symptoms
- assessment: thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar disc bulging 722.10; lumbar disc degeneration 722.52; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications

8/12/06
- subjective: moderate chronic lower center (spine) pain reported
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar disc bulging 722.10; lumbar disc degeneration 722.52; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications

9/9/06
- subjective: acceptably managed chronic lower back pain
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar disc bulging 722.10; lumbar disc degeneration 722.52; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; may have prescription if successful in decreasing pain

10/9/06
- subjective: acceptably managed chronic low back pain; sometimes has neck/shoulder pain
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar disc bulging 722.10; lumbar disc degeneration 722.52; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; repeat interventional pain procedures as indicated; consider lumbar median branch blocks, epidural steroids

11/6/06
- subjective: flared, chronic low back pain; lumbar paravertebral nerve blocks; current medications usually manage chronic pain symptoms
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- discussion: prognostic median branch blocks discussed in detail for possible future treatment of back pain; foraminal epidural steroid injection discussed in detail for recurrent leg pain
- plan: continue current medications

12/4/06
- subjective: acceptably managed moderate chronic low back pain
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and

disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications
<u>1/10/07</u>
- subjective: increased chronic lower back pain; current medications manage chronic pain symptoms
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; repeat interventional pain procedures as indicated
<u>1/25/07</u>
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- discussion: expect possible soreness in injected area 8-12 hours post-procedure followed by gradual improvement
- plan: F/U in office
<u>2/12/07</u>
- subjective: unchanged chronic lower back pain
- assessment:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; repeat interventional pain procedures as indicated
<u>3/14/07</u>
- subjective: acceptably managed moderate chronic lower back and between shoulder blades pain
- assessment: chronic pain due to 338.29:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; repeat interventional pain procedures as indicated
<u>4/12/07</u>
- subjective: slightly increased chronic lower back and between shoulder blades pain
- assessment:  chronic pain due to 338.29:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; repeat interventional pain procedures as indicated
<u>5/9/07</u>
- subjective: bilateral sacroiliac joint injection with arthrogram completed
- assessment: sacroilitis 720.2
- discussion: post procedure care

- plan: F/U scheduled
5/9/07
- subjective: unchanged moderate chronic lower back and shoulder blade pain
- assessment:  chronic pain due to 338.29:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; proceed with bilateral sacroiliac joint injection
6/14/07
- subjective: unchanged moderate lower back, right leg, and shoulder blade pain; current medications manage chronic pain symptoms
- assessment:  chronic pain due to 338.29:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; proceed with bilateral sacroiliac joint injection
7/20/07
- subjective: moderate chronic lower back and right leg pain; current medications manage chronic pain symptoms
- assessment:  chronic pain due to 338.29:  thoracic or lumbar disc degeneration 722.5; thoracic spinal stenosis 724.01; thoracic disc bulge 722.11; lumbar spondylopathy 721.3; lumbar disc degeneration 722.52 and disc bulging 722.10; muscle spasm and myofascial pain 729.1; dependent edema worsens in summer
- plan: continue current medications; proceed with bilateral sacroiliac joint injection


**Psychiatric Review Technique, David Allen, Ph.D., 6/13/07 (Tr. 279-92)**
- Medical Disposition: impairments not severe
- category upon which medical disposition is based:
	- 12.04 affective disorders - a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above disorder: depressed - per treating source
- functional limitation:
	- restriction of activities of daily living: none
	- difficulties in maintaining social functioning: none
	- difficulties in maintaining concentration, persistence, or pace: none
	- episodes of decompensation, each of extended duration: none
- C criteria: evidence does not establish the presence of C criteria
- notes: credible; treatment source observes mental/emotional status to have improved; Claimant is capable


**Physical Residual Functional Capacity Assessment, Fulvio Franyutti, MD, 6/13/07 (Tr. 293-300)**
Exertional Limitations
- occasionally lift: 20 pounds
- frequently lift: 10 pounds

- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
Postural Limitations
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: occasionally
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
- extreme cold: avoid concentrated exposure
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure
Symptoms: partially credible; allegations partially supported by findings; no atrophy present


**Inpatient Hospitalization Records, Rockingham Memorial Hospital, 6/27/07 - 6/29/07 (Tr. 301-18)**
6/27/07 Medical History and Physical
- chief complaint: chest tightness
- physical exam: obese; no acute distress
- diagnostic impression or assessment: chest pain radiating to left arm with nausea, rule out acute coronary syndrome; hypokalemia; mild elevated liver function tests; hyperlipidemia; hypertension; obesity
- treatment plan: admit for 23-hour observation; serial cardiac enzymes; check TSH reflex; stress test
6/27/07 Emergency Department Record
- chief complaint: chest pressure
- diagnostic impression or assessment: new onset chest pain, rule out unstable angina; hyperlipidemia; hypokalemia
- treatment plan: admit, condition is serious but improving
6/28/07 stress test
- indication: chest pain
- summary: probably normal myocardial perfusion study with breast attenuation noted; normal left ventricular systolic function
- discussion and plan: somewhat limited by breast attenuation; anteroapical defect is most likely

due to breast attenuation
6/29/07 discharge
- discharge diagnosis: gastroesophageal reflux disease; hypokalemia; hypertension
- discharge condition: stable condition on heart-healthy diet with activities as tolerated


**Emergency Department Record, Rockingham Memorial Hospital, 7/3/07 (Tr. 319-20)**
- chief complaint: bouts of her heart racing
- physical exam: afebrile; normal vital signs except for being mildly hypertensive; neurologically intact; heart has regular rhythm, no rubs; no anxiety or depression
- course in ER: start beta blockers; return if symptoms worsen


**Psychiatric Review Technique, Philip Comer, Ph.D., 8/31/07 (Tr. 328-41)**
- medical disposition: impairments not severe
- category upon which the medical disposition is based:
    - 12.04 affective disorders - a medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above disorder: depression
- functional limitation
    - restriction of activities of daily living: mild
    - difficulties in maintaining social functioning: mild
    - difficulties in maintaining concentration, persistence, or pace: mild
    - episodes of decompensation, each of extended duration: none
- C criteria: evidence does not establish presence of C criteria
- notes: functional limitations due to psychological factors do not meet or equal listings; statements reasonably consistent with other evidence in file and are credible from her perspective; appears to have mental/emotional capacity for work-related activity in a work environment that can accommodate her physical limitations


**Physical Residual Functional Capacity Assessment, Porfirio Pascasio, MD, 8/31/07 (Tr. 342-49)**
- primary diagnosis: DDD-LS/ BACJ & leg pain syndrome
- secondary diagnosis: thoracic foraminal stenosis
- other alleged impairments: obesity/ HBP/ GERD
Exertional Limitations
- occasionally lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
push and/or pull (including operation of hand and/or foot controls): unlimited, other than as shown for lift and/or carry
Postural Limitations
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally

- kneeling: occasionally
- crouching: occasionally
- crawling: occasionally
Manipulative Limitations: none
Visual Limitations: none
Communicative Limitations: none
Environmental Limitations:
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure
Symptoms: partially credible

**Medical Consultant's Review of Psychiatric Review of Technique Form, Maurice Prout, Ph.D; 9/19/07 (Tr. 350-51)**
- categories of disorders: agree
- rating of functional limitations:
        - daily activities: agree
        - social functioning: agree
        - concentration, persistence or pace: agree
        - decompensation: agree
- listing 12.02C, 12.03C, or 12.04C in remission: n/a
- listing 12.06C: n/a
- medical disposition: agree

**Medical Consultant's Review of Physical Residual Functional Capacity Assessment, Nisha Singh, MD, 9/19/07 (Tr. 352-53)**
- exertional limitations: agree
- postural limitations: agree
- manipulative limitations: agree
- visual limitations: agree
- communicative limitations: agree
- environmental limitations: agree
- symptoms: agree
- treating or examining source statements: agree
- comments: claimant reprs personal care no problem, prepares meals, cleans, sweeps, does laundry, walks, does grocery shopping, can lift and carry 20 pounds, walk for 20 minutes at her own pace; MRI thoracic spine T4-5 mild central canal stenosis, T6/7 moderate central canal stenosis, T7-8 mod central canal stenosis, T10-11 mod central canal stenosis

**Physical Residual Functional Capacity, 7/8/08 (Tr. 362-63)**
- spine disorders: degenerative disc disease; facet arthritis
- decreased sensation - bilateral L4, L5 distributions
- limitation of motion of spine
- bilateral pain present on straight leg raising

**Physical Residual Functional Capacity Questionnaire, Basye PA-C/ LK Gehman MD, 9/18/08 (Tr. 357-61)**
- diagnoses: lumbar spondylosis with radiculopathy
- prognosis: poor
- symptoms: severe pain low back radiating to right leg with leg weakness; occas numbness
         - aching severe low back pain daily - increased with nearly any activity
- clinical findings/ objective signs: abnl MRI, positive SLR
- incapable of even low stress jobs - pain aggravated by daily activities required at home
- functional limitations:
         - can walk ½ city blocks without rest or severe pain
         - can sit 30 minutes at one time before needing to get up
         - can stand 30 minutes before needing to sit or walk
         - can sit about 4 hours and stand/walk less than 2 hours in an 8-hour workday
         - needs to walk for 5 minutes ever 20 minutes
         - needs a job that permits shifting positions at-will
         - will need to take unscheduled breaks
         - legs should be elevated with prolonged sitting
         - can rarely carry less than 10 pounds and can never carry 20 or 50 pounds
         - can rarely look down
         - can frequently turn head right and left
         - can occasionally look up
         - can frequently hold head in static position
         - twist: rarely
         - stoop: never
         - crouch/squat: never
         - climb ladders: never
         - climb stairs: rarely
         - has limitations with reaching, handling, and fingering because of numbness in hands

D.     Testimonial Evidence

        Testimony was taken at the hearing held on February 10, 2009. The following portions

of the testimony are relevant to the disposition of the case:

        EXAMINATION OF CLAIMANT BY ATTORNEY:

        Q        Ms. Wilkins, could you state your name for the judge?

A       Diana Wilkins.

                        *               *               *

Q       Okay.  And are you married?
A       Yes, sir.
Q       Okay.  Do you have any income right now?
A       No, sir.
Q       Do you have any dependents living at home?
A       No.
Q       Okay.  And how old are you today?
A       Fifty.
Q       Okay.  And when is your birthday?
A       9/30 of '58.
Q       And how far did you make it in school?
A       I graduated 12 years.

                        *               *               *

Q       Did you get any vocational training?
A       Yes, I did.  In the 12 years, I went to a vocational center.
Q       Okay.  So that's through high school you had some vocational training?
A       Yes.
Q       Okay.  What was that training - -
A       In - -
Q       - - there?
A       - - cooking.
Q       Cooking?
A       Yes.
Q       Okay.  Other than the vocational training there in high school, did you have anything after high school?
A       No.
Q       Any - - do you have any licenses, certificates, anything like that?
A       No, sir.

                        *               *               *

Q       And then could you tell the judge, when did you last work?
A       February the 22nd of '06.
Q       Okay.  And what were you doing at that time?
A       I was cooking.
Q       Okay.  Who were you cooking for?
A       Hardy County Schools.
Q       And is that what you had done for the previous, I believe it was 12 years?
A       Yes, sir.
Q       Okay.  And through that entire time, were you cooking or were you doing other jobs with the Hardy County Schools?
A       No.  Those 12 years was cooking.

                        *               *               *

Q       Okay.  And then prior to that, did you do anything?

17

A       Prior to that, I was a substitute cook and substitute custodian.

Q       Okay.  And how long was that?

A       Five years of substitute custodian and then I was hired as a halftime custodian.

Q       Okay.  And then in that time, did you have any other jobs during that period of time?

A       I worked at a sewing factory for three or four months.

Q       Okay.  Well, let's talk about the cooking job.  I mean, that's the most significant length of employment.  I mean, I can only - - that's working in the cafeteria?

A       Yes.

Q       Okay.  Is that a job that you stood at?

A       I stood.

Q       Was that - - how much of your day did you stand?

A       Of an eight-hour day, probably six hours, six and a half hours.

Q       Did you get to sit at all?

A       For breaks, like a 15-minute break and another half-hour break at lunch.

Q       Okay.  How about - - did that job require you to walk around?

A       Yeah.  Well, almost run but yes.

Q       Okay.  And then how much weight - - what do you think of the range of weight that you were lifting when you were cooking?

A       There was times we - - I lifted between 40 to 80 pounds.  It depended on the cases of hamburger.

Q       Okay.  So you were stocking as well as - -

A       Yes.

Q       - - cooking.  Is that right?

A       Yes.

Q       Okay.  And that - - when you were doing that, were that requiring you to bend over?

A       Yes.

Q       Okay.  And then when you were doing I assume the substitute cooking work, that was the same, but let's talk about the janitorial work.  Was that a job that you stood in one place or you moved around a lot?

A       Moved around a lot.

Q       Okay.  And was that a job you got to sit at at all?

A       No.

Q       Okay.  And then how about the weight when you were doing the janitorial work?

A       The weight wasn't quite as bad then, but it consisted of scrubbing floors and sweeping floors, lifting trash, trash bags full of trash, throwing them into the dumpster.

Q       What do you think the range of weight that you lifted there?

A       Oh, probably 40 pounds, 50 pounds.

Q       Okay.  And then I assume that that's a job that you had to bend over a lot during?

A       Yes.

Q       Okay.  And then you just said you worked for how long at Heart [phonetic] Sewing?

A       It was only like three or four months - -

18

Q        Okay.  And - -

A        - - because then I got hired at the school system and I quit.

Q        Okay.  Now, was that a sitting job?

A        Yes.

Q        Okay.   And so you were at a station where you sat?

A        Yes, sir,

Q        Did you have to lift materials?

A        Yes.

Q        Okay.  How much weight were the - - how much did that weigh?

A        Oh, I would say probably 30 pounds.

Q        Okay.  And did that job require you to walk around the plant at all?

A        Not much, no sir.

Q        Was it a job that you had to bend over at your workstation, though?

A        Yes.

Q        Okay.  Let's talk a little bit about the pace of work that you had when you were cooking.  Can you describe, you know, how quickly you had to work then?

A        It was pretty much a time based thing.  You had to have your food ready, meals ready for when the students come in to get it and you had to have them served and out of the lunch line by a certain time.

Q        Okay.  And - -

A        You had like 10 minutes - - 10 to 12 minutes to get like 100 students through - -

Q        Okay.

A        - - and that was bending down, picking up your tray, sitting them down and then dipping the food onto the trays and sliding them on through.

Q        Okay.  And then what causes you to leave that job in February of '06?

A        I was in so much pain.

Q        Okay.  All right.  Well, let's talk about that.  Tell me about your pain.  Tell me where you have pain.

A        It started out in the lower back exceeding down into the right leg and I was getting to the point I was dragging the right leg.

Q        Okay.  Any other problems that you were having other than this - - the low back pain into your right leg at that time?

A        Not at that time.

Q        Okay.

A        Well, I was being doctored for high blood pressure, but I have been on blood pressure pills for several years - -

Q        That - -

A        - - before that.

Q        That wasn't what was keeping you from working?  It was - -

A        No, sir.

Q        - - this pain that you - -

A        It was just - -

Q        - - were having?

A        - - the pain.

19

Q        And then has things stayed the same or gotten worse since then?

A        They've gotten worse.

Q        Okay.  Describe how they're worse now.

A        One thing, the pain goes into the left leg also now besides the right leg.  It's going up further into the back and it's more - - it's going out into my right arm now.

Q        Okay.  And do you know why - - has anyone told you why you're having pain in your back and your legs and your arm?

A        I have degenerative disc disease.

Q        Okay.  Do you know what level that's at?

A        No, I do not.

Q        Okay.  Have you had testing, MRIs and things like that that have - -

A        I've had - -

Q        - - indicated that?

A        - - MRIs.  Yes.

Q        Okay.  Okay.  So this - - the disc issues - - okay.  Do you have any other problems that - - well, let's just start - - let's stay with your back.  Have you had any other problems that's sort of in the - - in your back or - -

A        Well, with the disc - - in the lower part of my back, they are bulging and then - - and pressing against the sciatic nerve.  And the middle part of my back, they are bulging in toward the spinal cord - -

Q        Okay.

A        - - and the doctors don't want to operate due to the fact it's it would be like open heart surgery.  And he said that it wouldn't be a success, that it was just no hope.

Q        Okay.  Any other problems other than - - I mean, other than your back with the sciatic nerve that's radiating into your extremities?  Is there any - - you mentioned your high blood pressure.  Do you have any other medical problems right now that are contributing to keeping you from doing stuff?

A        Mind wise, I am getting - - I think it's due to medications.  Mind wise, I'm very forgetful.  There is times I can't lift even with my hands due to the fact of whatever is happening with my arms now.

Q        Well, your medications, why don't you tell us a little bit about - - what medications are you on right now?

A        I take 12 different kinds of medications.

Q        Okay.

A        I take two - - I take a muscle relaxer.  I take pain medications.  I take three or four for blood pressure.  I take for depression.  I take an arthritis medication.

Q        Okay.  And now, how do those - - you said that those medications you think that are affecting your memory.  Are they affecting you in other ways, the side effects of the medications?

A        Tiredness and dizziness.

Q        Okay.  And you think that's because of the medications?

A        Yes, sir, I do.

Q        Is that - - did your doctors told you that or that's just what you think?

A       The doctors told me that, but then, yes, I know that's what - - I mean, I'm - - I've always been a very hyper energetic person - -

                   *           *           *

Q       Who is treating you for these problems?

A       Dr. Sherry at Blue Ridge Pain Clinic.  I also have a kidney problem.  I am seeing Dr. Arthur [phonetic] for the kidney problem.  I have a blockage in the adrenaline gland on the kidney and then I see Dr. Gaymen [phonetic] as my family doctor.

Q       This - - the kidney problem, what is that?  How does that affect you?

A       It could have something to do with blood pressure and the potassium.  I was in the - - I was hospitalized in 2007 with very low potassium which affected the heart and they say it's to do with the kidney but right now the surgeons do not want to operate to see - - they're waiting - - excuse me - - they keep taking CAT scans to see if it makes any changes before they do anything with it.

Q       Okay.  And then how long have you been seeing Dr. Sherry?

A       Since June of '06.

                   *           *           *

Q       And was - - did - - and how - - about how long have you been seeing Dr. Gaymen?

A       Oh, my.  Years and years.

Q       Is that your family doctor?

A       Yes, sir.

Q       Okay.  And so he's treated you for your illnesses as well as these back problems?

A       Yes.

                   *           *           *

Q       Well, let's talk about the things which you can and can't do.  Sitting, how long can you sit at a time?

A       Not very long.  I'm getting fidgety now.

                   *           *           *

A       On a good day, may be 15, 20 minutes.

Q       Okay.  And on a bad day?

A       Probably five.

Q       Okay.  And that's - - and then that's five minutes and then you'd have to stand up and shift around?

A       Yes.

Q       Okay.  How about standing?  How long can you stand before you've got to sit down?

A       Maybe 10, 15 minutes at the most.

Q       Okay.  Is that on a good day or a bad day?

A       Good day and bad day.

Q       Okay.  How about were you standing - - where you can sit and stand where you can alternate in between the two?  So like, you know, when you've at home, how long can you go where you're going back and forth between sitting and standing before your pain is real bad you've got to take a pill or you got to lay down to sort of stretch it all out? How long can you go?

A        You mean minute wise or hour wise?

Q        Well, I mean, if you can do it for more than an hour, tell me how long can you - - alternating between sitting and standing whenever, if you can just get up and get down as much as you want, how long can you go before that pain - - the pain gets on you to the point that you're losing focus or you're laying down?

A        Maybe half an hour to an hour.

Q        Okay.  How about walking?  How far can you walk?  Can you walk a block without -     A        No, sir.

Q        - - stopping?

A        No, sir.

Q        Okay.  Can you bend over?

A        Not very well.

Q        Okay.  Can you squat?

A        No, sir.

Q        How about your grasp?  You were mentioning problems in your right - -

A        In the right - -

Q        - - your right - -

A        - - side.

Q        - - hand.  Is that right?

A        Yes, sir.

Q        Are you having problems holding onto things in your right hand?

A        Yes.  I usually take my left hand and kind of support it.  I haven't dropped anything, but I kind of support just to be on the safe side to - -

Q        Okay.

A        - - keep from dropping or losing something.

Q        Okay.  And are you right-handed or left-handed dominant?

A        I'm right-handed.

Q        Okay.  And then when you say - - is it a weakness or are you losing like - - so you say you're not dropping things, but you feel like you can't - -

A        It's just weakness.  It's just - - but it's painful.  It's painful from the shoulder blade clear to the fingertips.

Q        Okay.   And that pain, does that pain increase when you're using your hand or is that pain that's just going to be there no matter whether you're using your hand or not using your hand?

A        It's pain that's going to be there.

Q        Okay.

A        And it gets worse actually when - - at nighttime.  Usually is when it's the worst is at nighttime.

Q        Okay.  So what are the things that - - I mean, are there things that you don't think you can do with your right hand anymore?  Can you carry a gallon of milk with your right hand?

A        No, sir.

Q        Okay.  When you're cooking, do you - - can you, you know, pick up your pot with your right hand?

A        No, sir.

Q      Okay.

A      And my son just got Internet and I wanted to just play around on the Internet. And I can't do it.

Q      Why is that?

A      My arm just gives out.

Q      Well, but you're not lifting anything when you're playing on it.  Right?

A      Well, even just the fact of just moving the fingers and just messing around.

Q      Typing hurts your hands?

A      Um-hum.

                  *            *            *

Q      All right.  How about reaching?  Do you have any problems reaching in front of you or overhead?

A      Overhead.  I cannot do it with my arm.

                  *            *            *

Q      Okay.  How about in front of you?

A      I can go pretty much out in front of me but can't go over the head.

Q      I assume you can't run.  Is that right?

A      No.

Q      How about weight?  How much weight can you lift?

A      I'd say 10, 15 pounds at the most.

Q      Okay.

A      That's using both arms.

Q      All right.  Well, let's talk a little bit about what's going on at home.  You know, who is doing - - how is this affecting you at home?

A      It has greatly affected me.

Q      Well, I mean, let's - - I mean, did you - - do you normally do the cooking in your house?

A      Yes, I do.

Q      Okay.  So can you - - do you have any problems cooking now?

A      It takes a lot longer than it used to take me.  I just have to take my time - -

                  *            *            *

Q      Well, I mean, you cooked for a living.  So let's - - I mean, what are - - are there things that you can't cook anymore than you used to cook?  I mean - -

A      Bread.  I used to make homemade bread quite often and - -

Q      Why can't you do that?

A      I can't.  I mean, it hurts to stand to kneed it.

Q      Okay.

A      Even to sit to kneed the bread dough down, I just can't do it.

Q      Okay.  How about the dishes?  Who is doing the dishes at home?

A      I do them.

Q      Okay.  And how long - - do you have a dishwasher or do you do it by hand?

A      No.  I do it by hand.

Q      Okay.  How long does it take you to do the dishes?

A      It takes me usually an hour.

Q       Okay.

A       But now that's - -

Q       Can you stand there for an hour and do the - -

A       No, sir.

Q       - - dishes?

A       I cannot.

Q       How do you do them then?

A       I wash awhile.  I sit awhile.  I get back up and wash awhile.

Q       Okay.  How about cleaning the house?

A       My family helps me.

Q       Okay.  And who - - when you say your family helps you, who is that?

A       My husband, my son and my daughter.

Q       Okay.  Do you - -

A       She doesn't live there.  She comes in and helps.

Q       Do you - - can you push the vacuum around?

A       No, sir.

Q       Okay.  How about laundry?  Who does the laundry?

A       Myself and my family.  They help.

Q       Okay.  Can you carry a basket of laundry?

A       No.

Q       So how do you get the laundry done?

A       Usually piece by piece.

Q       Okay.

A       I take it out of the dryer piece by piece, take it, put it away unless it's towels or something like that.  They'll put them in the basket, carry them for me and then I'll fold them and put them away.

Q       Do you have a yard at home?

A       Right now, no.  We just moved.  So no.   I don't have a yard.

                        *                    *                    *

A       We moved in September.

Q       Okay.  And when you had a yard, did you mow the grass?

A       Yes, I did.

Q       Okay.  Can you push a mower around?

A       No.

Q       So that's a riding lawnmower?

A       It - - well, yeah.  I pushed but not anymore.

Q       Okay.  Well, when you were - - when did you stop pushing the mower?

A       Oh, it was probably '05 would have been the last time I would have pushed mowed.

Q       Okay.  How about gardening?  Do you do any gardening?

A       Yes.  I love to garden.

Q       Okay.  Did you have a garden at your old house?

A       Yes.

Q       Okay.  Were you - - did you continue to garden up until September when you

moved?

     A     Very little.

     Q     All right.  Well, describe what kind of gardening you used to do versus the gardening that you did at the end.

     A     We used to - - well, we planted a full garden.  I'm saying cucumbers, squash, tomatoes, onions, potatoes, beans, the whole nine yards.  Yeah.  I used to take care of it all myself, worked it all myself, you know, the whole nine yards, but I can't bend down to pull weeds, can't pick the beans, can't pick - - every now and then I would walk through the garden, see a cucumber, pick it up - -

     Q     So when - -

     A     - - but - -

     Q     - - did you stop doing the vegetable gardening then?

     A     Probably 2006 was very little done in the garden.

     Q     Okay.

     A     We plan it.  They tend to it.

     Q     Okay.  Can you drive still?

     A     I do but I get very sleepy.

     Q     Is that because of the medications?

     A     Yes, sir.

     Q     So how far can you drive?

     A     A half an hour at the most.

     Q     How about riding?  Do you have any problems with riding in the car?

     A     Yes, I do.

     Q     Okay.  What's the problems?

     A     I get stiff.

     Q     Okay.  And today, how long was your trip today?

     A     It took us an hour and a half, hour and 45 minutes.

     Q     Okay.  And did you have to make any stops?

     A     We stopped twice - -

     Q     Okay.  Well - -

     A     - - and I got out and walked around.

     Q     - - was that to alleviate the pain?

     A     Yes.

     Q     Okay.  How about grocery shopping?  Can you - - do you go out and do the grocery shopping?

     A     My husband usually goes with me and I hold onto the cart for stability - -

     Q     Okay.

     A     - - to keep - - you know, just - - it hurts and I can't like bend to pick things up to put in the cart.  And I can't reach to get things.  So someone usually goes with me to get groceries.

     Q     How about - - can you lift the grocery bags or is that something your husband is doing?

     A     No.  They carry the groceries in.

     Q     Okay.  And how about socially?  Do you do anything socially?

A     Not like I used to.

Q     Well, what did you used to do?

A     Oh, I used to go to carnivals, help in the concession stands at the carnivals.  I used to go to football games, basketball games.

Q     Do you have grandkids or nieces and nephews that are involved in school activities or after school activities?

A     I got nieces and nephews that play ball.  They're involved in ball all the time.

*          *          *

Q     Okay.  Do you go to those games?

A     If they're where I can get to the field that there is no steps or no hills, that I can just walk flat ground to get to them.

Q     Okay.  But - - and can you climb up in a set of bleachers and sit there and watch - -

A     No.

Q     - - a game?

A     No.  I cannot.

Q     Tell me, how has this all affected you mentally?

A     It's very depressing.

Q     Okay.  And - -

A     I was always an outgoing person.

Q     And how does that affect when you interact with other people?

A     I think they could see a change in me.  I know two weeks ago my husband and I went out.  And a couple of my cousins were there and when we got home, he said that's the most he'd seen me laugh for a long, long time, because I really had fun and got to enjoy life for once.

Q     How often do you guys go out?

A     Not very often due to money and plus then I just never feel like going, never feel like getting ready to go.

Q     Okay.  And then how did you feel the day after you went out?

A     Very tired.

Q     Okay.  What did you do that day?

A     Went to church, came home, got something to eat and laid around the rest of the day.

*          *          *

Q     How does the pain and medication affect your train of thought?

A     I actually think it messes it up.

Q     Do you forget things?

A     Yes, I do.

Q     Give me an example of something you forget.

A     I can put something somewhere and within five minutes I have no clue where it's at -

Q     Okay.  Is that - -

A     - - or I can tell somebody something and I don't remember telling them.

Q     So is the issue more of a short term what's going on sort of in the last hour or two or is it you're forgetting things from your past?

A      No. It's the last hour or two.

Q      Okay.

A      It's not the past.

Q      How long has this numbness in your hands been going on?

A      About six to eight weeks now and it just - -

Q      That's in the - -

A      - - keeps - -

Q      - - right hand where it's got - -

A      In the right hand, yes.

Q      - - where it's gotten particularly bad?

A      Yes.

Q      Had you had - - but you had had some tingling and numbness before that?

A      Yes.

Q      Okay. But then in the right hand it's gotten significantly worse?

A      Yes, really worse.

              *                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW
JUDGE:

Q      And would you describe her work in the past 15 years as - - in terms of skill and
exertional levels?

A      Work as a substitute custodian, exertional level is medium. Skill level is semi-
skilled. Work as a cook in the school system, exertional level is medium. Skill level is skilled.

Q      All right. Then let me ask you to assume a hypothetical individual of the
Claimant's age, educational background and work history who would be able to perform postural
movements occasionally except could not climb ladders, ropes or scaffolds or perform balancing
type maneuvers, should do walking to the maximum extent possible on level and even surfaces,
should not do any overhead reaching or lifting, should not be exposed to temperature extremes,
wet or humid conditions or hazards. Would there be any work in the regional or national
economy that such a person could perform?

A      The region I'll be using today is all of West Virginia, western Maryland, western
Pennsylvania and eastern Ohio. Under the light exertional level, Your Honor, a mail clerk
working in private business. National number is 202,000, regional, 2,300. And because the
hypothetical includes a sit/stand option, I have reduced those numbers in half, Your Honor. Also
under the light exertional level, a garment sorter, 178,000 nationally, 1,500 regionally and, again,
I'd reduce those numbers in half, Your Honor, because of the sit/stand option. And that's based
upon my experience placing individuals. Those are a sampling, Your Honor.

Q      Okay. And other than the sit/stand option, is anything in your testimony
inconsistent with anything contained in the DOT?

A      No, Your Honor.

Q      And let me ask you this, would any of the skills from the - - either the custodian
or cook job be transferable to lower levels of exertion?

A      Well, the skills as a cook could be transferred to like employment like a short-
order cook which the exertional level is light for short-order cook and the skill level is semi-

skilled.

Q   All right.

A   And that's about the only thing, Your Honor.

ALJ   Okay.  Very well, Counselor?

ATTY The short-order cook, does that come with a sit/stand option?

VE   No.  It does not.

ATTY Okay.  Let's begin with a - - the hypothetical that the ALJ presented, but let's add to it that in a typical workday the hypothetical person would have - - would frequently have their attention and concentration interfered with because of pain and that would happen frequently which would be, you know, up to one-third to two-thirds of the day.  Would there be any jobs?

ALJ   That she would be off task - -

ATY   Yeah.

ALJ   - - for that?  All right.

VE   If the individual were off task that amount of time, then there would not be jobs available.

ATTY Okay.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q   And then let's remove that from the hypothetical and if this person was incapable of tolerating even a low stress job, would there be any jobs available?

A   Well, these are unskilled, routine, repetitive types of jobs and they don't really have very much stress connected with them.  All jobs have some amount of stress just because you have to be at work and you have to perform work activities.

Q   Okay.  So if this person was incapable of dealing with work stress, then that person would not be able to work?

A   No.  They would not.

Q   Okay.  And then if - - let's remove that from the hypothetical and instead place into the hypothetical that this person could only sit for 30 minutes at a time and only stand for 30 minutes at a time.  Would that preclude any of the employment that you have mentioned?

A   No.  It would not.

Q   Okay.  And then if we added in addition to that this person could only stand and walk for less than two hours and could only sit about four hours in an eight-hour day, would that preclude employment [INAUDIBLE] any of these jobs listed?

A   Yes, it would.

Q   Okay.  And if - - and let's remove that from the hypothetical, the sit/stand and the sitting stuff and let's instead, again using the hypothetical that the ALJ provided, if this person needed to walk around every 20 minutes for at least five minutes at a time, would that preclude employment in any of these job situations?

A   Well, if the individual could stay on task while they were doing that, no.  It wouldn't preclude it.  But if they're walking around every 20 minutes, I don't know how they could stay on task.

Q   Okay.  Okay.  So then that's a no, though?  That would be - -

A   That's a no.

Q   Okay.  And if this person required their legs to be elevated at least to heart level for four hours, would there be any jobs available?

      A       No.  There would not be.

      Q       No.  Okay.  And let's remove that from the hypothetical and instead, this person can rarely lift less than 10 pounds or 10 pounds or less and can never lift more than 20 pounds.  Would that preclude employment in any of those jobs?

      A       In the jobs that I listed, yes.  It would preclude those jobs.

      Q       Okay.  But that would - - would that preclude sedentary work as well as just light-duty work?

      A       Just light duty.

      Q       Okay.  And if this person was precluded from using her right hand which is her right - - her dominant hand during work, would that preclude employment in those - - in the light-duty level?

      A       I would in the jobs that were listed.

      Q       Okay.  Would there be other jobs with the hypothetical that could be done where it would be only one handed?  Would there be any jobs one handed?

      A       Under the light exertional level?

      Q       Under the light exertional level with the sit/stand option, the occasional posture limitations, though, without the balancing, the level walking, no overhead, the extreme temperatures, the hypothetical that the judge provided at the beginning of - - any jobs that would - - could be done one handed?

      A       No.  I don't have any jobs available.

      Q       Okay.  And then - - and if we removed that from the hypothetical and then we'd say that this person - - the hypothetical person here would have good days and bad days that would require them to miss four days or more a month from work, would there be any jobs available?

      A       No.  There would not be - -

      Q       That's all - -

      A       - - any jobs available.

         *            *            *

E.       <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how Claimant's alleged impairments affect her daily life:

- cannot sit for long periods of time (Tr. 40)
- cannot stand for long periods of time (Tr. 41)
- cannot bend or squat (Tr. 41)
- has problems grasping on right side (Tr. 42)
- cannot lift with right hand (Tr. 43)
- gardens (Tr. 48)
- does laundry every other day (Tr. 46, 146, 148)

- prepares meals daily (Tr. 44, 146, 148)
- takes care of animals (Tr. 147)
- has difficulty sleeping (Tr. 147)
- can no longer wash walls or windows (Tr. 147)
- can no longer drive (Tr. 147, 149)
- drives but has difficulty because she is tired from medications (Tr. 48)
- no problems with personal hygiene (Tr. 147)
- does not need reminders to take care of personal needs or grooming (Tr. 148)
- does not need reminders to take medication (Tr. 148)
- cleans up after cooking and does dishes (Tr. 45, 148)
- cleans, sweeps, mops, dusts (Tr. 46, 148)
- sweeps once daily (Tr. 148)
- mops once weekly (Tr. 148)
- does not do yard work (Tr. 149)
- goes outside everyday (Tr. 149)
- grocery shops (Tr. 49, 149)
- is able to pay bills, count change, and use a checkbook/money order (Tr. 149)
- does not handle a savings account because she does not have one (Tr. 149)
- walks as a hobby once daily but cannot walk far if legs are hurting (Tr. 150)
- cannot walk a block without stopping (Tr. 41)
- reads as much as possible but cannot read if in a lot of pain because she cannot concentrate (Tr. 150)
- watches and feeds birds (Tr. 150)
- watches television (Tr. 150)
- likes to spend time with others (Tr. 150)
- talks on the telephone daily (Tr. 150)
- visits with family (Tr. 150)
- goes to church every Sunday (Tr. 150)
- can no longer go to sporting events because she cannot climb steps or bleachers (Tr. 50, 151)
- follows written instructions well if she can understand what she is reading (Tr. 151)
- gets easily confused when following spoken instructions (Tr. 151)
- gets along well with authority figures (Tr. 152)
- does not handle stress well at all (Tr. 152)
- is not bothered by changes in routine (Tr. 152)
- it is apparent through the record that Claimant suffers from obesity

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant argues that the ALJ erred in finding that the record supports a finding that

Claimant retains the ability to perform light work.  Specifically, Claimant argues that, in making

this finding, the ALJ improperly rejected the opinions of treating physicians because they were based on Claimant's subjective complaints.

Commissioner contends that substantial evidence supports the ALJ's Residual Functional Capacity finding. Additionally, Commissioner contends that the ALJ properly weighed the medical opinion evidence before discounting Claimant's treating physicians.

B.    Discussion

1.  Whether the ALJ Erred in Discounting Claimant's Credibility

Claimant argues that the ALJ improperly rejected the opinions of Claimant's treating physicians because they were based on Claimant's subjective complaints. Claimant contends that the ALJ's credibility finding was based on an inaccurate recitation of Claimant's testimony. Specifically, Claimant argues that, contrary to the ALJ's findings, Claimant testified it takes her an hour to wash dishes; her husband, son, and daughter assist with housekeeping because Claimant is not able to push a vacuum; Claimant's family helps with the laundry; and Claimant is not able to mow the yard or work in the garden.

Commissioner made no specific contention as to Claimant's credibility but only emphasized that Claimant's own reports of her daily activities included doing laundry; washing dishes; caring for pets; cooking; regularly performing household chores such as sweeping, mopping, dusting, and making beds; reading; watching television; walking; attending church; socializing; participating in church-related activities; and grocery shopping.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3) (West 2010). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than

a preponderance."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  "Substantial

evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood,

487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971).  The

decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding

of no disability is supported by substantial evidence."  Johnson v. Barnhart, 434 F.3d 650, 653

(4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)).  The ALJ's decision

must be upheld if it is supported by "substantial evidence."  §§ 405(g), 1383(c)(3).

Claimant argues that the ALJ's decision is not supported by substantial evidence because

the ALJ improperly discredited Claimant's subjective complaints.  While it is true that under the

Regulations the ALJ must consider certain factors when evaluating credibility, the Fourth Circuit

stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater,

76 F.3d 585 (4th Cir. 1996).  Under Craig, when a claimant alleges disability from subjective

symptoms, he must first show the existence of a medically determinable impairment that could

cause the symptoms alleged.  Id. at 594.  The ALJ must next "expressly consider" whether a

claimant has such an impairment.  Id. at 596.  If the claimant makes this showing, the ALJ must

consider all evidence, including the claimant's statements about his symptoms, in determining

whether the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's

statements, he need not credit them to the extent they are inconsistent with the objective medical

evidence or to the extent the underlying objective medical impairment could not reasonably be

expected to cause the symptoms alleged.  Id.

SSR 96-7p sets forth certain factors for the adjudicator to consider when determining

credibility. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

The ALJ properly followed the two-step analysis outlined in Craig. First, the ALJ considered whether the Claimant had an impairment stating "that the [C]laimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. 13). The ALJ then weighed Claimant's testimony in considering all the evidence and concluded that "[C]laimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 13).

In accordance with the factors set forth in SSR 96-7p, the ALJ examined the objective

medical evidence, Claimant's daily activities, and Claimant's statements concerning the limiting effects of his symptoms. First, the ALJ examined the objective medical evidence and found that the objective medical evidence did not support Claimant's subjective complaints. In March and April 2006, Claimant had an MRI of the lumbar spine and the thoracic spine. Both surgeons reviewing the lumbar spine found that the MRI "actually looked 'quite good.'" (Tr. 13). The surgeons reviewing the thoracic spine MRI found "that surgery was not warranted, and offered only weight loss and possible referral to pain management." (Id.). Additionally, the ALJ noted that "[d]espite the findings on MRI studies, the claimant's physical and neurological examinations have been predominantly normal, with only a few notes of spasms, decreased range of motion, and subjective reports of altered sensation." (Id.).

Second, the ALJ found that Claimant's allegations of severe pain were not credible because they "are inconsistent with the contemporaneous notes of the claimant's treatment and they are inconsistent with the claimant's reported activities." (Tr. 14). The ALJ relies heavily on treatment notes from Dr. Sherry finding that "[f]rom the beginning of his treatment in June 2006, Dr. Sherry has noted the same factor that was noted by Dr. Willison - the claimant's pain is effectively managed by medication. In each appointment note, Dr. Sherry noted that the claimant's current medications effectively manage her moderate chronic pain symptoms." (Id.). Dr. Sherry also notes that he administered monthly trigger point injections to provide 75% or more relief for 2-3 weeks out of the 4 weeks between Claimant's appointments. (Id.). According to the ALJ, "[t]hese notes are in direct contradiction to the claimant's statements regarding constant, severe, disabling pain, and render those statements less than fully credible." (Id.). The ALJ also finds inconsistencies between Claimant's statements regarding medication

side effects.  Neither Dr. Sherry, who managed the claimant's pain medications, nor any of the

primary doctors or evaluating neurosurgeons had a single note of reported side effects.  (Id.).  As

for activities, the ALJ found that Claimant's allegations were inconsistent with the reported

activities.

> The claimant does laundry, cooks, and regularly performs household chores, such
> as sweeping, mopping, making beds, and doing dishes.  The claimant reads books,
> goes to church, socializes, participates in church-related activities, goes to the
> grocery store and attends sporting events.  (Exhibit 4E and testimony).  These
> activities are inconsistent with the claimant's allegations of severe, disabling pain
> and are entirely consistent with a person who has moderate chronic pain
> controlled by medications and injections, the same picture created by the
> contemporaneous notes of the claimant's treating pain specialist.

(Id.).

Accordingly, the Court must disagree with Claimant and conclude that the ALJ had more

than substantial evidence to discount Claimant's subjective complaints of severe, disabling pain.

2.    Whether the ALJ Erred by Discounting the Opinions of Claimant's Treating
      Physician

Claimant also argues that the ALJ erred by discounting the opinions of Dr. Gehman

because they are based primarily on Claimant's subjective complaints rather than medical

findings.  Specifically, Claimant argues that the ALJ erred in discounting Claimant's subjective

complaints, in finding that great weight need not be afforded because Claimant's physical

capabilities were not formally tested and Dr. Gehman had not seen Claimant since July 2007,

and in failing to provide findings from a doctor presenting sufficient persuasive contradictory

evidence.

Commissioner contends that the ALJ carefully considered the medical opinions of record,

weighed them against the remainder of the evidence, and articulated legally sufficient reasons to

support his evaluation of the medical opinion evidence, as he was required to do so in accordance with the regulations.  Specifically, Commissioner contends that the ALJ properly declined to give significant weight to the responses contained within the Questionnaire signed by Claimant's family doctor and physician's assistant, as well as the Interrogatories allegedly completed by Dr. Sherry, because the responses were not supported by the evidence in the record and were solely based on Claimant's subjective complaints.  Commissioner also contends that the responses were inconsistent with the medical evidence, the opinions of the state agency physicians, and Claimant's activities of daily living and were not contemporaneous with recent treatment.      All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b) (West 2010).  The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2) (West 2010); see Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

    While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence.  Evans, 734 F.2d at 1015.  To

decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Heckler, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(2) (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

The Court cannot agree with Claimant's contentions. Claimant first argues that the ALJ erred by rejecting Dr. Gehman's opinions because they were based on Claimant's subjective complaints, which the ALJ found lacked credibility. Claimant argues that "there is no medically acceptable objective testing for pain complaints. Therefore, Dr. Gehman's opinions can be based upon subjective findings based upon the longstanding treatment relationship and physical examination." (Dkt. No. 15, P. 8-9). The ALJ need not give controlling weight to a treating source's opinion unless it is supported by medical evidence and is not inconsistent with other

substantial evidence in the record.  The Court has already determined that the ALJ did not err in

concluding Claimant's subjective complaints, which were not supported by medical evidence,

lacked credibility.  Accordingly, the ALJ did not err by rejecting the treating source's opinion,

based on Claimant's subjective complaints.

Claimant next argues that the ALJ erred by finding that the opinions should not be given

great weight because Claimant's physical capabilities were not formally tested and the

physicians had not seen Claimant since July 2007.  While Claimant contends that she had

objective testing, including x-rays and MRIs, which revealed medical problems that could

reasonably produce her pain symptoms, Claimant fails to cite to the record to support these

contentions.  On the contrary, the ALJ found that MRIs of the lumbar spine and thoracic spine

were read by doctors who concluded that the spine "looked quite good" and that "surgery was

not warranted."  (Tr. 13).  Additionally, the ALJ noted that the neurosurgeons "offered only

weight loss and possible referral to pain management," and one neurosurgeon was indecisive on

pain management because Claimant's "pain was adequately managed by activity and pain

medication."  (Id.).  Claimant also contends that she had "physical examinations, range of

motion testing and straight leg raise testing."  (Dkt. No. 15, P. 8).  Again, contrary to Claimant's

contentions, the records Claimant cites are all from February and March of 2006.  This does not

support Claimant's contentions that she has been seen and tested after July 2007.

Finally, Claimant argues that the ALJ provided no contrary medical evidence, which the

ALJ may use to discount Claimant's treating physicians, and the medical evidence supports a

finding that Claimant is disabled.  The Court cannot agree.  When discounting the opinions of

Dr. Gehman, the ALJ stated "[t]here is simply nothing in the contemporaneous notes of Dr.

Gehman or Ms. Bayse that indicates that the claimant has any weakness of her right leg, numbness of the right leg, or a need to elevate her legs for any periods of time let alone four hours a day, or even a condition that would require elevation of the legs. Their notes do not indicate any problems with attention, concentration, dealing with stress, side effects of medication or complaints of numbness in the hands." (Tr. 15). Additionally, the ALJ found that, when examining the medical records, Dr. Gehman had not examined Claimant since July 2007. Therefore, the opinions written in 2008, could only be based on Claimant's "subjective reports and speculation." (Id.).

Though Claimant does not specifically address the ALJ's rejection of Exhibit 19F dated July 8, 2008, (Tr. 362-63), the ALJ also rejects this opinion. It is unclear from the record which doctor completed this RFC Assessment; however, the ALJ assumes it is Dr. Sherry because "Sherry" is written at the top. Accordingly, the ALJ finds that the RFC Assessment cannot be given controlling weight because it is contradictory to Dr. Sherry's records. First, the ALJ finds that it appears Dr. Sherry had not seen Claimant since July 2007. Second, the ALJ finds that Dr. Sherry's "contemporaneous examination notes do not show any findings of decreased sensation at the L4-5 distribution, and in fact, repeatedly note that sensation is normal." (Tr. 15). The ALJ also indicates that Dr. Sherry's notes do not support the contention that Claimant's lumbar range of motion is limited and Dr. Sherry does not indicate that he has ever tested Claimant's straight leg raising.

Controlling weight may be given only in appropriate circumstances to medical opinions: when the opinions is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. 20 C.F.R.

§416.927(d)(2). Thus, controlling weight may be given only if both parts of the test are met. Here, the ALJ did not err by failing to give controlling weight because Dr. Gehman's opinions were not well-supported by objective medical evidence: the ALJ found that the opinions were not supported by the doctors' own records, Claimant's subjective complaints lacked credibility, and the opinions were contradicted by other medical evidence. It is the ALJ's job to determine whether to give controlling weight to a treating physician. It is the job of the Court to determine if substantial evidence exists to support the ALJ's decision. The Court cannot say that the ALJ's decision is not supported by substantial evidence.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.     Claimant's Motion for Summary Judgment be **DENIED** because the ALJ did not err by failing to give controlling weight to Claimant's treating physicians and properly assessed Claimant's credibility.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED:   May 18, 2010

/s/ **James E. Seibert**

JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE